We will turn to the day calendar and first we'll hear Greene v. City of New York. Thank you. Good morning. Good morning, your honors. May it please the court. My name is John Schuette and I represent the plaintiff appellant Cy Greene. Let me begin by stating four facts that we believe were proven in the record below. An innocent man named Cy Greene was convicted of the murder of John Choi because police and prosecutors committed constitutional misconduct. The constitutional misconduct was committed to protect two informants at the expense of two innocent men. The informants actually participated in the crime and we believe the record reflects that. Police and prosecutors either fabricated or withheld vital exculpatory evidence to protect these two informants and preserve the arrest and conviction of Cy Greene, both pre-trial and post-trial, during post-trial criminal proceedings. Mr. Greene was unjustly incarcerated for close to 23 years. These facts were proven below by sworn testimony or reasonable inference and at a minimum factual issues abound which should have precluded the grant of summary judgment. The district court turned the summary judgment standard on its head by disregarding sworn testimony, by making credibility determinations, and by failing to apply reasonable inferences requested by the non-movement. Sworn testimony, for example, was ignored from Assistant District Attorney Douglas Callen who authenticated his pre-trial notes confirming that a deal was offered to prosecution witness Mark Best. Sworn testimony was also ignored from the criminal defense attorney who said he had never seen before in his life detectives' notebooks which contained critical exculpatory information. The record is replete. I thought counsel couldn't remember if he got the notebooks. Your Honor, early in his deposition, defense counsel testified that he no longer had his file and had no general recollection of what was. This is significant. Yes, Your Honor. Because he represented to us that he said he never in his life saw them. He couldn't remember whether he saw them. And indeed, part of the problem here is that the 440 motion that was granted relied in part on defense counsel's admission that he received certain police reports and he did not interview any of the persons referred to in those reports. That included statements about some of the individuals you're now talking about which suggested that he was aware of most of the essential facts that you're talking about. So I'm not sure where we get to a conclusion that notebooks were withheld. I don't see where you've deduced any evidence of that. Can you help me out? Yes, Your Honor. I will attempt to. I think Attorney Lewis Cohn, when he was deposed, was close to 80 years old. He did his best to recall what he did and did not see. When he was specifically presented with the notebooks themselves, he was asked a series of questions. Have you seen these before? No, I've never seen these before in my life. And he went on to say that he would have used them in the criminal proceedings if he had them. And I refer to the case of Boyette in the Second Circuit, which is probably one of the most important cases for us on this appeal. If the criminal record does not contain any reference to these exculpatory materials, there's a reasonable inference that they weren't provided to defense counsel. Now, the city and the defendants in this case have not addressed the Boyette case. And at least in opposing a summary judgment motion, there's a factual issue presented. If Lewis Cohn says early in the deposition, I don't recall, but later when he's presented with a specific document to refresh his recollection, he says, I've never seen that before in my life, and yes, I would have used it if I had it, has the non-movement opposing summary judgment and inferences that he didn't get it, or at least there's a factual issue on that particular item, the detective's notebooks. Now, on the plea deal with Mark Best, we should get to that immediately, because the city has taken a position of the defendants that we can't prove that a deal was offered. And I submit to you that that- You have two Mr. Bests here, right? Yes. Now, you're talking about Mark Best. I'm talking about Mark Best, who was a prosecution witness. The one in my mind did not testify. He was the fellow at the top of the steps. Yes, Your Honor. Yes, Your Honor. Okay. What's interesting about Mark Best is, post-trial, he admitted in several affidavits that he was a participant in the crime, that he was offered a deal, and that he was- The court made findings on that, that he wasn't credible. Yes, Your Honor. That he'd been influenced by your client. Well, here's what I would like to do. I offer- I mean, you know, you can't ask us to accept evidence that was specifically rejected by the court as not credible. I may or aren't. Let's take you back to your impeachment argument, or your failure to provide the impeachment evidence. The witness didn't testify. And his hearsay declaration was offered by the defense. So, I'm not sure how it qualifies as material that's required to be turned over. Your Honor, first of all, Mark Best, his account of the crime, was first introduced by the assistant district attorney. He was asked during his direct examination of Detective Tamburello, what did Mark Best say? It was not defense that opened that door. It was the assistant district attorney, and I believe we've made that very clear in our brief. The prosecution offered Mark Best testimony originally through Detective Tamburello. And Judge Pesci allowed that hearsay statement in. Once that hearsay statement came in, the door was open, and it was never shut. Mark Best's account of the crime, he was then cross-examined by defense attorney, Louis Cohn, and the assistant district attorney then put Detective Norito on the stand and also brought out Mark Best's account of the crime. In fact, Detective Norito said his account of the crime, Mark Best, was the same as Jay Kim's, the only witness who testified against Mr. Green. Now, under Second Circuit precedent, LECA, United States v. Jackson, if a deal is made with a prosecution witness, it has to be disclosed. And a deal was definitely proffered here. It's in the notes of the assistant district attorney, and he admits he didn't disclose it. Would you get briefly to the issue of the Panamanians and the taxi kids? Thank you, Your Honor, because what I really wish to do, it's very difficult to present this in a brief. If I may, I will walk you through the day of the crime and talk about the police records and what they show. The most significant... What is it that was not disclosed to the defense? I mean, we have all of these facts. It's complicated. There's the staircase down, the staircase up, the people running out, running past, getting in a cab. We have all this. What was not disclosed to the defense? Thank you, Your Honor. It's the most important question on this appeal. And if you give me a minute, I will walk you through how we... You have a minute and a half. Let me walk you through how we connect the dots. What was not disclosed was the significance of the passengers in the cab scene leaving the crime scene. And Detective Nerito was allowed to testify those people had nothing to do with the crime. That is absolutely wrong. If you trace the significant... He didn't say they had nothing to do with the crime. What did he testify to? He testified at the criminal trial. When he was asked a question about the significance of those people, he said they had nothing to do with the crime. And he formulated an excuse for them. Now, let me tell you how I know that's wrong. The stabber was wearing a brown, chocolate brown distinctive shirt. You can trace his movements through the DD-5s from the exit at the subway station, from point A to point Z, the taxi cab, through eyewitness accounts. In fact, one witness, James Robinson, chased him to the taxi cab. The cab driver's statements to the police were suppressed. Detective Tumbarello took two pages of notes, and those are in the appendix at pages 311 to 312. Those notes were not disclosed. In fact, everything relating to the cab driver was suppressed. Your client testified at the 440 hearing that he asked counsel to talk to the cab driver because the cab driver was saying that the people ran. The people ran. That's his testimony at the 440 hearing, which can only be construed to mean that they were aware of these facts. Your Honor. That's why he wanted his lawyer to question the people. Your Honor, I believe you're referring to a post-conviction hearing 20 years— But he's testifying to what he asked his lawyer to do. This is how he secured the habeas relief, by arguing that he asked his lawyer to do these things and that counsel didn't. Yes, Your Honor. What occurred in the years two decades after Mr. Green's conviction was that private investigators were hired who began to dig and see things that the original criminal defense attorney— I do not understand your client to have testified at the 440 hearing that at trial he asked his lawyer to question the cab driver who said that people ran away. Your Honor, I agree with you that Louis Cohn was ineffective. But look— No, but the reason why he was ineffective was because a client asked him to do something that he didn't do. That was part of his ineffectiveness. Right. So I don't know how you can argue that this fact wasn't known when your client testified that he knew it and he asked his lawyer to act on it. But, Your Honor, what wasn't known was the details provided by the cab driver, that the brown-shirted stabber was 5'10". My client is 5'1". That's quite different from your representation to us that all of this was withheld. I also want to take you back to what you argued here in court about what Detective Tamburello said during his direct examination. I've just looked at that. I don't see anywhere where Detective Tamburello testified that Mark Best made an identification. He testified that Kim viewed the lineup and that a second witness also viewed the lineup. But there was specifically no mention of Best making an identification. Am I missing something? I'm looking at pages 960-73 of the record. Your Honor, the door was open once the government identified a second witness and said a second identification was made. It didn't say that. No one says that. Point me to where in the record anybody says a second identification was made. It says he viewed the lineup. And Detective Norito subsequently took the stand and testified that Mark Best accounted the crime. On cross-examination, Detective Norito was asked and testified that Mark Best picked him out. That's the whole point of the government's argument, that it didn't have to disclose the facts pertaining to the identification because it didn't elicit the identification. Respectfully, I disagree. If the government says to a jury that a second witness has identified this individual. Counsel, where does the government say that? All that I see is that he said that he viewed the lineup, not whether he did or didn't make an identification. Your Honor, in my rebuttal, I'll find that section of the record and provide it to you. Was it the prosecution's theory that the men who jumped into the taxi cab were the assailants? No, Your Honor. They took the position that the men who jumped in the taxi cab had nothing to do with it and it was over an opinion offered by Detective Norito, who confessed there was a confidential informant in the cab and that he determined, in his opinion, that they had nothing to do with the crime. When you cobble that together with the admissions of the actual participants in the crime, who unfortunately are deceased. Was defense counsel advised that one of the people who climbed into the taxi cab was wearing a chocolate-covered shirt? I think so. He may have been, Your Honor, but what happened at the time, too, the way defense counsel had his hands— Was he aware that they were tall? Was he tall? He was aware that there was someone tall with a brown shirt who jumped into a cab. Was he aware that they spoke Spanish? No. Was he aware that they were Panamanian? No. Detective Norito was the first prosecution person to confess to that. Did Norito know that they spoke Spanish and were Panamanian at a time when he could have conveyed that to the prosecutors? Yes, Your Honor, he interviewed them. Did he? Well, he admitted that— Did he say he told that to the prosecutors? He admits that they were suspects, but he—no, he never told that to the prosecution. He downplayed the significance of the people in the cab. Mr. Green is not Panamanian. No, he's not, Your Honor, and he doesn't speak Spanish, and he's 5'1", not 5'10". Thank you. We'll hear you on rebuttal. Good morning. Good morning, Your Honors. My name is Aaron Bloom. I represent the defendant's appellees in this case. This court should affirm the district court's grant of summary judgment. The appellant, Cy Green, was convicted at trial based on an eyewitness identification by the victim's friend who was with the victim at the time the victim was murdered. Green's conviction was later reversed based on— The victim's friend was the Korean gentleman. That's correct. He was at the other end of the subway platform. Well, he was in the subway platform— No, he was in the subway platform. He was at the other end of the subway platform. There were two stairs moving at the other end of the subway platform. Right. I don't know that he was still all the way at the other end, but it is true that— People stabbing people at the other end, people don't usually run to watch, do they? Well, he was running to help his friend, he said. Right. He did end up getting in a struggle with one of the assailants, but he said that he was able to see and he identified the assailant in a lineup. Your Honors, let me speak to the issue, obviously, in this case, is not whether or not Mr. Green is innocent, but whether he has made out his claims for Monell and fair trial liability. The simplest way to deal with the Monell claim, I'll just take off at the top, is that there has been no evidence presented by Green of a prior pattern of constitutional violations similar to the one that is alleged here by the DA's office. All of the Monell's claims have to be based on such a prior pattern under the Supreme Court's decision in Connick. That was not addressed at all in the appellant's papers, despite our brief addressing it in detail. Below, when that issue was fully addressed, all that plaintiff provided was a spreadsheet of cases, but only two of those cases predated the date of the trial here that involved Kings County DA's office. Those two cases do not involve Brady violations that have anything remotely to do or are similar to what is being alleged here. In any case, in Connick, the Supreme Court said that four prior Brady violations over a period of ten years was not enough to establish a pattern. Here we have only two dissimilar violations addressed before. There's just no pattern. There's no evidence of a pattern here. In terms of the taxi cab, what did the record at trial show? I mean, defense had knowledge that four men ran pell-mell into a taxi cab. The cab driver said, I'm off duty, and they said, go anyway. Correct. We're in a big hurry. But all of that came out of trial? All of that was definitely in the DD-5s that were undisputedly provided to defense counsel. The defense counsel did not call those witnesses at trial. Which witnesses are you speaking of? The witnesses who testified that they saw people running and then getting into the cab. Or the cab driver, the cab driver himself who had a DD-5 was also not called as a witness. And the defense knew of the cab driver and knew how to find the cab driver? That's right. The DD-5 provided the cab driver and I believe provided the cab driver's address, certainly the cab driver's name. Am I correct that Officer Norito interviewed the men themselves and found out that they were Panamanian and he would know? They spoke Spanish to him, I guess. Well, yeah, I don't know how he knew that they were Panamanian. What he testified at his deposition is that he surmised that he believed that they were Panamanian. He said he spoke to two of them. And they spoke Spanish? The speaking Spanish is not from Norito, but perhaps they did. The speaking Spanish was noted in Tamburello's notes. Tamburello's notes based on his speaking to whom, the cab driver? The cab driver, yes. And that was turned over to the defense? Well, so what was turned over to the defense was, we submit there's no evidence that Tamburello's notebook was not turned over to the defense. They argue that the notebook was not turned over. Certainly the DD-5, which discusses the cab driver, was turned over to the defense. I believe there's no evidence that Tamburello's notebook also was not turned over to the defense. I mean, if we talk about . . . Did the DD-5 say that the people in the cab spoke Spanish? No. Their point is that it's only in the notebook that the speaking Spanish. To address two parts . . . Panamanian nationality? That's something that, with regard to Norito . . . Norito established. That's right. But did not tell the prosecution. That's correct. But the prosecution . . . Don't you think that that's useful? I mean, you have four people running pell-mell out of the train station immediately after the stabbing. They commandeer a taxi cab and order him to go, even though he's off-duty. And they're Panamanian, and Mr. Green is not. Well, I think we have to look at this, both in terms of the elements that need to be established here. What was withheld, and was there any intentional withholding of impeaching or exculpatory evidence? That's what I'm asking you. Right. Let's focus on Panama. Right. They're Panamanian. It's very easy to establish that Mr. Green is Panamanian, and it's conceded that he isn't. Well, I think there's no basis . . . Four Panamanian people jumped into the taxi cab immediately after coming out of a subway stop, where somebody has just been stabbed. They commandeer a taxi cab, and they're tall, and Mr. Green is short by comparison. And so, again, some of this information, obviously, about the tall, the defense already had. But taking what Nerido learns about the taxi cab occupants at some later point, what he testified is, A, what they told him . . . Where? Hmm? A 440 hearing? No, he testified at deposition in this civil trial. Because when you say . . . Sorry. I appreciate that. It's a long history. You're right. You're right. I'm sorry. He testified at deposition in 2009, perhaps. And that's where this is . . . the only time this is mentioned, that he actually did speak to these two of the cab occupants. He learned of them only at some later point in the investigation, after an identification had already been made of eyewitness . . . Two eyewitness . . . Before the trial. Before the trial. That's right. But, at that point, two eyewitnesses' identifications had already been . . . He was continuing the investigation. Well, what he said was someone told him that they had . . . someone told him in his office that they had . . . some had found out that . . . what the address of these . . . of one of the passengers in the cab was. So, he went to speak with them, and what they told . . . Would that have been the cab driver who would have records as where he dropped them? It was . . . it does not . . . there's no evidence that that was the cab driver. What they told him was that they gave him another explanation of why they were in a rush and that they were not involved. And, at that point, what Detective Norito said at his deposition was that he believed that that lead was a dead end . . . And, he didn't . . . he didn't make a note of it. He had already had the two eyewitness identifications, and so he didn't pass it on. What we have here is no evidence of an intentional withholding of material that Norito knew to be exculpatory or impeaching. That's based on the idea that Norito knew the conclusion. He knew that Mr. Green had done it. Well, that's based . . . And, the question is that there's no evidence to . . . there's no evidence besides speculation to say that he intentionally withheld . . . that he intentionally withheld evidence that he knew to be exculpatory or impeaching. That there's just . . . there's not a basis. I mean, he's being told evidence that seems to actually support the view that the cab was not involved and that, in fact . . . But, there's evidence that the cab . . . people in the cab were not involved. As far as I can see, they're the people who rushed out. I don't even know where Mr. Green was supposed to have gone. All of that evidence . . . What did they get on the . . . But, that's not the evidence that was told to Norito. All of the evidence about that . . . that puts . . . that would suggest that the cab was involved was already provided. What was told to Norito and that he didn't note down and thus didn't . . . and didn't pass on . . . was that they . . . that the people in the cab that he spoke to said that they were rushing to go to . . . One of them had a girlfriend who was having a miscarriage. They were rushing to go to be with her. Somebody stabs somebody and a cop asks, where were you going? You don't usually say, I was running like hell just to get out of the scene. You come up with a reason why you were in a rush. Well, I . . . He's a detective. Well, again, to the . . . one might question whether he was doing good detective work. But, that doesn't translate into an intentional withholding of known . . . of known exculpatory evidence. I'll be frank with you. It was that statement, just before we get off this point. It was that statement that was not disclosed, but the fact that the cab picked up these folks and . . . Yes, and the . . . And the cab driver and everything else was disclosed. That's right. And, in fact, what was disclosed was that their heights were . . . that their height . . . that they were tall. That was disclosed. All the evidence of that would suggest that there were people who were running from the scene to the cab and that they were in a rush. That they told the cab driver that they were in a rush was disclosed. And, in fact, you know, the . . . the . . . the defense counsel . . . criminal defense counsel was aware that fingerprints had been taken of the cab. But, all of this, you know, is . . . there's all . . . there's no evidence that anything . . . So, A, I believe that there's no evidence that this was . . . that a rational jury could believe that this was an intentional withholding of exculpatory evidence. It's also no evidence that it's material that would have materially changed the outcome of this trial. You know, you would have to suspect that somehow, you know, defense counsel would have . . . this would have caused defense counsel to change his theory of the case or somehow argue . . . argue this case differently. I don't think that there's evidence that . . . that this would have materially changed the outcome of the trial either. So, that's another factor of the element of the claim that's not here. Just with regard to the issue of the notebooks and the idea that Cohen said he never saw . . . that he never saw the notebooks. Immediately after he said he never saw those notebooks, he clarified, A, I don't really know. Then he said, I absolutely have no recollection. And then, he even went so far as to say, everything I said before about not having seen these notebooks, that was told . . . I'm just repeating what was told to me by post-conviction counsel, Myron Beldock. I have no basis myself for saying so. So, and in fact, elsewhere in the record, Beldock admits that he doesn't have complete records of what defense counsel had. So, there's no basis for any assumption that these notebooks weren't turned over. Thank you.  Thank you, Your Honors. Judge Raggi, just to answer your question quickly in rebuttal, I direct you to the Appendix 966 through 967. And actually, it begins on 965. Question. During a direct . . . I'm sorry. Let me get . . . I'm sorry. What proceeding are we in here? We're at the criminal trial, Detective Tumbarello on redirect, A966, at page . . . at line 19 through 25. Detective Tumbarello was asked, how far away was Mr. Kim from the lineup? Approximately eight feet. And, how far away was Mr. Best from the lineup? Eight feet. And, they were . . . both of them viewed the lineup from a different room from where the defendant and the fillers were. Correct? Correct. Detective Tumbarello was asked by the prosecutor about the lineup. They viewed the lineup. Yes. And, he confirmed that through Detective Norito, subsequently, if you take both detectives' testimony, that Best was a witness who confirmed the account of J. Kim. But, Norito is on cross-examination when he says that. You elicited it. Otherwise, there wouldn't have been any evidence that Best made an identification. Yes, Your Honor. All right. Thank you. Assuming that everything Your Honor says is correct, it was a prosecution witness for whom a proffer of a deal was made and it was not disclosed, black-letter law says that's a constitutional violation. If the taxicab with the people running into it was deemed to be an important matter at the time by the defense, why wasn't that the defense theory? One of the problems the defense counsel had is that the DD-5s provided by the people were all . . . the names and addresses were all blacked out. We've submitted that as part of the record. What defense . . . You need the names and addresses. You have four people. You have four people. They're tall. They rushed into a cab running out of the exit from where the victim was stabbed to death. Yes. If the defense wasn't going to run with that, what difference would it have made if they were Panamanian? The difference would have been if Reynold Guerriere, the taxi driver's, full statement had been produced. Now, let me make it clear. What was not produced was Tamburello's notebook. No DD-5 was created from that interview. Detective Herlihy initially interviewed the cab driver and only scant information . . . The question is what pieces of information that would have been important to the defense was withheld from the defense, intentionally or not? Let's find out first what it was, if anything, and then you can decide if it was done intentionally. Well, there was a complete lack of disclosure by Detective Nerito.  And that constituted what to . . . Judge Jacobs needs any help, but what evidence was in that, that was not turned over? That would have been helpful to the defense? That the cab driver got a good enough look at them to know that the brown-shirted man was 5'10", that he spoke Spanish, and that would have led to more evidence. Then, if you cobble that together with other things Nerito fabricated, on the arrest worksheet, instead of listing Cy Green's actual height, he listed his height as 5'5". If you then consider that Detective Nerito conveniently dismisses Lenny Best as someone who was identified as a suspect by one of the eyewitnesses and substitutes a third party's name, add that in the mix. And then if you add certain other things that Nerito did . . . Yeah, but that name may have been left out of one report, but it was in another report of another detective. It was in Detective Tumbarello's notebook, which was not produced. So Lenny Best was not known as a suspect. In fact, Lenny Best was brought in to the police precinct the day after the incident as a suspect, escaped from a police car, and that wasn't disclosed to the defense. There's an absolute plethora of information that was not disclosed to the defense, and it was vital exculpatory information. If Lenny Best was a suspect, that would seriously impugn Mark Best. And Mark Best was held out as a trial witness with a deal in immunity, and that wasn't disclosed. Now cobble that together with the confessions we subsequently have, where the five people who are now deceased confessed to family and friends that they were involved in the crime. Their confessions absolutely fit like a glove to this crime. When you go through the eyewitness accounts, when you go through the fact that 2009, Detective Nerito for the first time admits they were Panamanian. Well, Mark Best admitted in his confession that they were Panamanian, so did William How would Mr. Best know they were Panamanian? He was part of a pickpocket crew with them. And in fact, Detective Nerito knew there was a Panamanian crew pickpocketing, using that train station in that area to pickpocket. What you have here is two informants who were protected. Mark Best is protected, and a street, we only know his street name, Fulo, is protected. And Detective Nerito fully admits in his civil rights deposition, Fulo was an NYPD confidential informant. Thank you. Thank you both. We'll reserve decision.